## RALEIGH INVESTMENT COMPANY v. S. J. BUNK-ER, Appellant.

### Division Two, December 15, 1920.

1. **CORPORATION: Unpaid Stock: Suit Against Stockholders: Referee: Suit in Equity.** A proceeding against stockholders, after return of a *nulla bona* execution issued under a judgment against the corporation, to enforce its payment, although one on execution under the statute to recover upon unpaid stock, will be dealt with by the appellate court upon equitable principles, and conclusions will be reached upon the evidence, ,independently of the conclusions of the referee and trial court.

2. ————: **Unpaid Judgment: Unpaid Stock: Proceeding Against Stockholders.** In view of the constitutional and statutory provisions, that stock or bonds of a railroad corporation "shall be issued only for money paid, labor done, or money or property actually received," the courts will determine, in a proceeding against stockholders to enforce payment. of a judgment against the company after the return of a *nulla bona* execution, what portion of the stock issued to a subscriber had been paid at the time of its delivery, where it recites that it was fully paid and non-assessable, notwithstanding the certificate of the Secretary of State issued to the railroad company.

3. ————: ————: ————: ————: **Purchaser from Subscriber: Knowledge.** The purchaser of stock from a subscriber to whom it was issued, with knowledge that the stock had not been fully paid for either in money or money's worth, and that not to exceed twenty per cent of its face value had been paid for either in money, property or services, may be compelled, by a proper proceeding upon execution, after a return of a *nulla bona* execution issued under a judgment against the company in favor of a creditor of said company, to pay to said creditor, in satisfaction of said judgment, the difference between the face value of the stock purchased by him and said twenty per cent; and the evidence in this case shows that the purchaser from the subscriber, at the time of his purchase and from the organization of the company, had both actual and constructive notice that not exceeding twenty per cent .of the face value of the stock had been paid and that the remaining eighty per cent was at no time paid.

4. ————: **Stock: Purchaser: Untransferred Upon Books: Equitable Owner.** The purchaser of stock from the subscriber to whom is-

sued, although it has not been transferred to him upon the corporation's books, but entitled to be so transferred, is its equitable owner, and, in an equitable proceeding, may be compelled to pay the judgment of a creditor against the company, after *nulla bona* return of execution, to the extent that the unpaid portion of said stock, issued with knowledge on his part that it had not been paid for, bears to its face value.

Appeal from St. Louis City Circuit Court.—*Hon. Karl Kimmel*, Judge.

AFFIRMED.

*Jesse McDonald, George B. Webster* and *Arnold Just* for appellant.

(1)  Appellant was a bona-fide purchaser of the stock without knowledge that it was partly unpaid, and he is not liable. Keystone Bridge Co. v. McCluney, 8 Mo. App. 496; Berry v. Rood, 168 Mo. 316; Cook on Corporations, sec. 257; Skrainka v. Allen, 76 Mo. 384; Erskine v. Loewenstein, 82 Mo. 301; Meyer v. Ruby Co., 192 Mo. 162; Bonet Const. Co. v. Central Am. Co., 153 Mo. App. 185. (2)  The blocks of fourteen shares and eighty shares not being transferred on the corporate books from Evans to appellant, as required by the terms of the certificate, appellant is not the stockholder as to such shares and is not liable thereon. 14 Corpus Juris, 781; Cook on Corporations (7 Ed.), secs. 258, 260; People's Bank v. Stadmuller, 150 Cal. 106; Marlborough Mfg. Co. v. Smith, 2 Conn. 579; Topeka Mfg. Co. v. Hale, 39 Kan. 23; Robinson v. Southern Bank, 180 U. S. 295; Wilson v. Ry. Co., 108 Mo. 588.

*Connett & Currie* and *John A. Gilliam* for respondent.

(1)  Appellant is liable as purchaser of stock to the amount of $80 per share with interest at six per cent computed from date when be obtained the stock on at least 119 shares of stock bought by him from E. E.

Evans, the promoter and president of the company. Enright v. Heckscher, 240 Fed. 863, 153 C. C. A. 549; Davis v. Scott, 195 S. W. (Ark.) 383; Luehrmann v. Title & Trust Co., 192 S. W. 1026; Van Cleve v. Berkey, 143 Mo. 109; Rumsey Mfg. Co. v. Kaime, 173 Mo. 551; Berry v. Rood, 168 Mo. 316; Meyer v. Mining & Milling Co., 192 Mo. 162; Trust Co. v. McMillan, 188 Mo. 568; State ex inf. v. Hogan, 163 Mo. 43; Shickle v. Watts, 94 Mo. 414; Keystone Bridge Co. v. Barstow, 8 Mo. App. 494; Keystone Bridge Co. v. McCluney, 8 Mo. App. 496; Moores v. Citizens Nat. Bank, 111 U. S. 156; Rhoads v. Blatt, 84 Pa. St. 31; Shober v. Wheeler, 113 N. C. 370; Bay v. Cook, 31 Ill. 336; Scoggin v. Schloath, 15 Ore. 380; Shaw v. Ansoldi Co., 165 N. Y. S. 872; Stevens v. Episcopal Church History Co., 140 App. Div. (N. Y.) 570; Sand Co. v. Crematory Co., 205 Ill. 42. (2) The transferee of stock, if taken with notice that the stock is unpaid, is liable for the amount unpaid. Cook on Corp. (7 Ed.) sec. 293, and cases cited in notes, and Secs. 373, 374, 375, 376, 377, 378, 379, 380, 381, 382, 383 and note 4 on Sec. 384 of Cook on Corp. (5 Ed.); Trust Co. v. McMillan, 188 Mo. 568; Shaw v. Spencer, 100 Mass. 302; Coleman v. Howe, 154 Ill. 472; Wilson v. Met. El. Ry. Co., 120 N. Y. 152; Rogers v. Stag Mining Co., 185 Mo. App. 675; Cypress Lumber Co. v. Shadel, 52 La. Ann. 2094; Howes v. Chaille, 129 Ind. 435; Jackson L. S. & R. Co. v. Davison, 65 Mich. 416; Sicker v. Rambousek, 193 Mo. 113; Stephenson v. Kilpatrick, 166 Mo. 262; Ins. Co. v. Smith, 117 Mo. 261; Thompson on Liability of Stockholders, sec. 129. (3) The buying of stock from the president of a corporation which is standing in his own name, and which is sold for his own benefit, within a short time after the incorporation of the company, at about ten per cent of its par value, puts the purchaser upon inquiry, is a badge of fraud, and the purchaser is not a bonafide purchaser of the stock, but is liable for all that is unpaid on the stock. Cook on Corp. (7 Ed.) sec. 293

and note; Mores v. Citizens Natl. Bank, 111 U. S. 156; Van Cleve v. Berkey, 143 Mo. 109; State ex inf. v. Hogan, 163 Mo. 43; Davis v. Scott, 195 S. W. (Ark.) 383; Allen v. Ligon, 175 Ky. 767; Robinson v. Robards, 15 Mo. 459; Fisher v. Shelver, 53 Wis. 498; Boyd v. Ellis, 11 Iowa, 97; Dodson v. Cooper, 50 Kan. 680; Kuykendall v. McDonald, 15 Mo. 416; Fisher v. Lewis, 69 Mo. 632; Lionberger v. Baker, 88 Mo. 447; Hudgins v. Kemp, 61 U. S. (20 How.) 45; Trust Co. v. McMillan, 188 Mo. 568; Farrington v. Railroad, 150 Mass. 406; Hoppin v. Doty, 25 Wis. 591; De Witt v. Perkins, 22 Wis. 473; Auction & Com. Co. v. Mason, 16 Mo. App. 473; Eck v. Hatcher, 58 Mo. 241; Webster v. Upton, 91 U. S. 65; Ins. Co. v. Sherwood, 72 Mo. 461. (4) The circumstances of this case show that Bunker got thirty-five shares direct from Evans at $10 per share, and 102 shares by contract for relieving him from a $450 note, and eighty shares by relieving him from an $800 note, that at the time of getting the last 102 shares Bunker was secretary of the company and shortly thereafter became its president and general manager, and he is bound by the transfer for the unpaid amount on the stock and is estopped to deny his ownership and liability. Trust Co. v. McMillan, 188 Mo. 568; State ex inf. v. Hogan, 163 Mo. 43; Gillett v. Chicago Title & Trust Co., 230 Ill. 373; Nelson v. Chicago Title & Trust Co., 230 Ill. 440; Kemp v. Chicago Title & Trust Co., 230 Ill. 495; Meyer v. Mining & Milling Co., 192 Mo. 162; Erskine v. Lowenstein, 82 Mo. 301; Garrett v. Kansas City Coal Mining Co.. 113 Mo. 338; Schroeder v. Edwards, 267 Mo. 481; Clark & Marshall on Corp. sec. 605, p. 1842; Sec. 4184, p. 7257, Fletcher's Corporation Cyclopedia; Cutting v. Damarel, 88 N. Y. 410; Sayles v. Bates, 15 R. I. 342; Dain Mfg. Co. v. Seed Co., 95 Mo. App. 144; Wilson v. Railroad, 108 Mo. 609; Keystone Bridge Co. v. McCluney, 8 Mo. App. 496; Camden Land Co. v. Lewis, 101 Me. 78; Moore v. Barrel Co.. 238 Ill. 544; Shaw v. Straight,

107 Minn. 152; Moore v. Township of Kenochee 75 Mich. 351; Jones v. Shafer Iron Co., 96 Mich. 98; Camden v. Stuart, 144 U. S. 104; Herbert v. Duryea, 164 N. Y. 596; Patterson v. Woolridge, 170 Ky. 748; Upton v. Tribilcock, 91 U. S. 47.

RAILEY, C.—On June 15, 1915, plaintiff obtained a judgment in the Circuit Court of the City of St. Louis, Missouri, against the Bismarck, Bellevue & Western Railway Company, for $17,572.08, upon which judgment an execution and *alias* execution were issued, and returned *nulla bona* by the sheriff. On April 3, 1916, plaintiff filed, in the circuit court aforesaid, its notice to defendant, S. J. Bunker, informing him as to the rendition of said judgment and the return of *nulla bona* aforesaid; and likewise notifying him that on Monday, April 3, 1916, it would move said court for an order against said defendant for an execution against him as a stockholder of said railroad company for the amount of said judgment and costs, or for such portion thereof as this defendant was liable to pay. On April 3, 1916, respondent filed a motion in said court for execution as aforesaid, and on April 12, 1916, filed an amended motion for execution against said Bunker as a stockholder in said railroad company and, after describing the judgment in favor of plaintiff as aforesaid, alleged that an execution had been issued on said judgment and a *nulla bona* return made thereon; that said Bunker was a stockholder in said company to the extent of 340 shares of the par value of $100 each; that one hundred per cent of the par value of 165 shares of said stock remains unpaid; that ninety per cent of the par value of 139 shares of said stock remains unpaid; that said S. J. Bunker purchased said stock with knowledge that nothing had been paid on said 165 shares of stock, and that only ten per cent of the par value of said 139 shares of stock had been paid. Respondent herein asked for an execution against said Bunker, as a stockholder aforesaid, to col-

lect $29, 010, or as much of said sum as may be necessary to satisfy the judgment aforesaid, being the sum remaining unpaid on the shares of stock held by defendant Bunker.

Appellant herein filed his return, and alleged therein that he is a stockholder of said railway company, but denies that he ever subscribed to the capital stock of same; denies that he was an incorporator thereof, or that he had any knowledge of its organization. He avers that on April 5, 1921, E. E. Evans was the owner of certain shares of the capital stock of said railway company, and that, on said date, he purchased from said Evans, for a valuable consideration then paid to to him, ten shares of the capital stock aforesaid; that he purchased the same in open market, upon the assurance and under the belief, that the same had been fully paid, and that said certificate, representing said ten shares, upon its face stated that they were paid in full and were non-assessable; that he had no notice or knowledge to the contrary; that he then believed, and still believes, that said shares were fully paid, non-assessable, and that no liability attached to the holder thereof, and he so avers; that by reason of the premises, he is not liable for the payment of any portion of said ten shares of stock, etc.

On September 18, 1916, respondent herein filed a reply to the return of appellant aforesaid, and denied all the allegations of new matter contained therein. It is further alleged in said reply, that said railway company was incorporated under the laws of Missouri, with a capital stock of 3,000 shares of the par value of $100 each, to build a railroad from Bismarck, Missouri, to Sunlight, in said State; that its first stockholders' meeting was held on March 23, 1912, and the following persons were its organizers, promoters, and constituted its first board of directors, namely, E. E. Evans, C. E. Hamilton, J. R. Roycroft, Edward T. Eversole, P. T. Ramsey, H. P. Hathaway, H. H. Albert, Walter C. Haeussler, E. E. Gimlin, Grant Wyatt and Louis Hud-

son; that at said meeting, E. E. Evans was elected president of said corporation, C. E. Hamilton vice-president, and J. R. Roycroft secretary and treasurer. It is averred that said directors and Dr. John L. Eaton, and other persons unknown to respondent, were a syndicate, organized to promote said corporation; that each of said parties had put up before that date about $250 in the promotion of said corporation; that said E. E. Evans had put in means of his own to the extent of about $1750, in addition to the $250 aforesaid, and about $2500 of borrowed money; that all of said sums, amounting to about $7,000, had been used in making surveys, procuring charter, getting agreements for rights-of-way, and deeds for rights-of-way, for said railway company; that the total amount of all payments made by said syndicate, all voluntary contributions made, and services rendered to said railway company, did not exceed $8,000, up to and including the first day of April, 1912; that on March 23, 1912, said directors, including E. E. Evans, who was present, passed the following resolution, to-wit: "Mr. Wyatt moved that the company purchase the rights-of-way, contracts, field notes and all property pertaining to proposed road between Bismarck and Sunlight, from E. E. Evans, and pay said Evans for same, including all moneys advanced for organization expenses, the sum of one hundred and two thousand dollars, said property to be free and clear of debt, and that said consideration be paid, two thousand dollars in cash, and one hundred thousand dollars in common stock of the company, fully paid and non-assessable; seconded by Mr. Hathaway, and carried."

It is further averred, that in pursuance of said resolution, which was entered on the proceedings and minutes of said board of directors, on April 1, 1912, a certificate of stock for 1,000 shares of common stock in said company, purporting to be of the par value of $100 per share, was written up and signed by said E. E. Evans as president, and said J. R. Roycroft as secretary, in the stock certificate book, and there remained

until about July 12, 1913; that about 140 other certificates for stock, amounting to about 550 shares, were issued to divers persons, purporting to be transferees, from said E. E. Evans, before said certificate was formerly surrendered by said Evans, and other certificates for about 450 shares issued in its stead; that each and all of said directors were interested with said Evans in getting said resolution passed; that no money was paid to said Evans at that time, nor was any money paid into the corporation's treasury at that time for any of said stock. It is averred that the entire consideration for said 1,000 shares of stock, and said $2,000 so voted, paid in money and labor to said company, in services, contracts, for rights-of-way, property, surveys, charter and legal expenses, did not exceed in value $8,000; that said 1,000 shares taken by said Evans had not to exceed $6,000 paid on them; that about $94 per share was unpaid thereon.

The reply contains other allegations, tending to show notice to appellant herein as to how the stock to Evans had been issued, as well as in respect to other matters tending to show appellant bought with notice, that the capital stock which was delivered to him was not paid up in full, and had not been paid in excess of $20 per share.

It is further alleged that appellant purchased from said Evans, as a part of said $1,000 shares, on May 7, 1912, 25 shares; on August 13, 1912, 10 shares; on July 19, 1913, 1 share; on November 12, 1913, 10 shares; on July 18, 1914, 200 shares; and on August 13, 1914, 94 shares of stock, making a total of 340 shares, of the par value of $100 per share; that said $1,000 shares were issued to said Evans, as aforesaid, within four days after said railway company was chartered. It is further charged that Bunker knew that said Evans was promoting said company for about 14 months before said stock was voted to him; that he was president of said company; that while promoting same, he was a clerk in the employment of the U. S. Government at a

small salary; that he was a man of limited means, worth not exceeding $2,000, and with poor credit; that said Evans had not paid for said stock in money, labor, services, or property, in excess of six dollars per share; that he was publicly offering it for sale, within a month after it was voted to him, at ten dollars per share; that appellant knew all the facts aforesaid, or by the exercise of reasonable care, diligence, inquiry and investigation he would have known said facts; that defendant did not pay for said stock over $2,200, and owes, therefore, $29,010, etc.

On December 5, 1916, the court heard part of the evidence and ordered that the cause be referred to a referee. Mr. Frank A. Thompson was appointed referee, qualified as such, took the testimony, and made a report of his proceedings to the trial court on October 8, 1917. After carefully reading and considering all the facts as presented in the record before us, we are satisfied with the statement and finding of facts made by the said referee, and hereby adopt the same applicable to the case before us, as follows:

"Statement of the Case.

"This case was heard on the issues raised on eleven motions for execution against certain persons mentioned in the motions who had purchased stock from one E. E. Evans who was a promoter and large stockholder of the defendant railway company, the theory of the plaintiff in each motion being that the stock of E. E. Evans was unpaid and that each of the stockholders had purchased said stock from E. E. Evans under such conditions as to make them liable to plaintiff for the unpaid portion of said stock.

"Facts with Reference to the Organization of the Company and Issue of Stock to E. E. Evans.

"Mr. Evans is now about forty years of age. In January, 1911, he conceived the idea of building a railroad about eighteen miles in length, starting at Bismarck, Missouri, and running west to Sunlight, Missouri. He was at the time a reputable man in the

Government employ at Saint Louis, Missouri, but of no particular means. He interested several gentlemen in Saint Louis in the matter and then went to Bismarck and Sunlight and interested several gentlemen in that locality and along the proposed line. Between the time that Evans first conceived the idea of building this railroad in March, 1912, he spent seven or eight months in interesting people in the matter and procuring rights-of-way and bonuses and subscriptions for stock for the proposed railroad, and during all of that time he was occupying a Government position and drawing seventy-five dollars per month. After having interested a number of men as aforesaid in the matter, on or about March 19, 1912, he, together with the other men whom he had interested in the matter, filed articles of incorporation with the Secretary of State in accordance with Article II, Chapter 33, Revised Statutes 1909, by which it was provided that the name of the proposed corporation should be the Bismark-Bellevue Valley & Western Railway Company; that it should continue for a period of fifty years; that its purpose was to build a railroad from Bismarck in St. Francois County to Sunlight in Washington County; that the capital was to be $300,000, divided into 3,000 shares of $100 each, and that the board of directors should be composed of eleven persons named therein, and that 300 shares were subscribed for. Thus the corporation was launched.

"On the 23d day of March, 1912, the directors of the Bismarck-Bellevue Valley & Western Railway Company held their first meeting. These directors were associates of E. E. Evans, and upon a resolution prepared and presented the corporation purchased from E. E. Evans all of the rights-of-way, bonuses, subscriptions to stock, and services rendered by E. E. Evans in the promotion of said railway company and amounts expended and advanced by him in and about the promotion of said company, and allowed him for these items by way of payment two thousand dollars in cash and one thousand shares of the stock of the company of the

par value of one hundred dollars each, making altogether, a payment to Evans of one hundred and two thousand dollars for services, rights-of-way, bonuses and subscriptions, money advanced and money expended by E. E. Evans.

"It is the contention of the plaintiff in this case that instead of all this being worth one hundred and two thousand dollars, it was in reality worth not to exceed nine thousand dollars. A certificate for one thousand shares of the par value of one hundred dollars each was immediately issued to E. E. Evans. Within a few weeks thereafter, E. E. Evans commenced selling this stock. His regular price seemed to be ten dollars per share. He sold some, however, for less than this and in one or two instances for a little more. Each of the eleven individual defendants mentioned in this case against whom a motion for execution has been filed became a purchaser or holder of some part of this stock so acquired as aforesaid by E. E. Evans.

"On the 15th day of June, 1915, plaintiff in this case obtained judgment against the Bismarck-Bellevue Valley & Western Railway Company in the Circuit Court of the City of St. Louis for $17,572.08, which judgment is recorded in Book 250, page 430. Execution was issued and a *nulla bona* return was made by the Sheriff of the City of St. Louis, which is Execution No. 62 of the October Term, 1915. Upon the return of this execution unsatisfied, the plaintiff filed these eleven motions for execution against these individual defendants, which motions are in the nature and correspond to a bill in equity, their object being to compel the individual defendants to respond to the plaintiff for the unpaid portion of the stock which they hold so acquired from E. E. Evans, as aforesaid. These motions are all alike and all state that the individual defendants or stockholders purchased their stock from E. E. Evans with knowledge that the same was unpaid. To each of these motions the defendants filed a return, all similar, in which each of the defendants denies that he pur-

chased the stock having any knowledge of the manner in which it was paid for, but that he purchased it in good faith upon the open market and upon representation that it was fully paid and not assessable stock and that he had no knowledge whatsoever to the contrary. To these returns the plaintiff filed a reply, in which it is alleged that the individual defendants purchased the stock with full knowledge of how it was paid for, knew the conditions under which it was issued and all the facts and circumstances surrounding the issuance of the stock, and had knowledge, or what amounted to knowledge, that the stock was not fully paid. It might be stated here that none of the defendants except P. T. Ramsey took part in the organization of this company as original stockholder or director, although defendants S. J. Bunker and P. H. Cureton became much interested in the company and helped materially to promote it very shortly after March 23, 1912.

"Findings.

"Your referee finds that the one thousand shares of stock issued to E. E. Evans, as aforesaid, was paid to the extent of not over twenty per cent. That eighty per cent, or eighty dollars on each share, is unpaid. Indeed, E. E. Evans himself admitted before the Public Service Commission that it was only twenty-five per cent paid. All of the certificates which all of these defendants received from Evans read that the stock was fully paid. Your referee finds that of the defendants, three are liable, to-wit, S. J. Bunker, P. H. Cureton and P. T. Ramsey; that the remaining defendants are not liable. Your referee finds that the three defendants who are liable purchased their stock under the following conditions, to-wit:

"First, S. J. Bunker, an experienced man, became interested in this railroad and had a conference with E. E. Evans in St. Louis in January or February, 1912. Shortly after the organization meeting of March 23, 1912, he prevailed upon E. E. Evans to divert the proposed road from Sunlight, Missouri, to Bunker, Mis-

souri, and that in conversations and before he purchased any stock, E. E. Evans told him all about the organization of the company and told him the manner in which he had procured his stock, and shortly thereafter, on, to-wit, May 7, 1912, he purchased of Evans twenty-five shares and thereafter acquired fourteen shares for paying a part of a $450 note of Evans, and eighty additional shares for paying a note of Evans amounting to $800, so that your referee finds that S. J. Bunker acquired one hundred and nineteen shares of stock from E. E. Evans with actual knowledge of the manner in which E. E. Evans had acquired it, with actual knowledge of what Evans turned over to the company to pay for it, and your referee finds that, knowing this, he cannot believe that S. J. Bunker could really have come to the conclusion that the property put in for Evan's stock was worth $102,000, whereas it was worth but a very small proportion of that amount. Plaintiff contends that S. J. Bunker is liable upon an additional 200 shares of stock which was to go to Bunker and become his property upn the completion of the railroad, but since the road was never completed, your referee finds, under the conditions of the agreement, S. J. Bunker never became the owner of this stock and is not liable thereon," etc.

The referee, in his conclusions of law, recommended that judgment be entered in favor of plaintiff and against defendant Bunker for $9,520. Appellant filed exceptions to the report of the referee, which were overruled and, on December 2, 1918, the court confirmed said report, and entered its judgment in favor of plaintiff for $9,520, with interest from April 3, 1916, at six per cent per annum, amounting in the aggregate to $11,041.61.

Defendant Bunker, in due time, filed his motion for a new trial, which was overruled and the cause duly appealed by him to this court.

I.   It has long been recognized as the settled practice in this State, to deal with questions like those be-

fore us *upon equitable principles,* although this is a pro-
ceeding on execution under the statute to re-
cover upon unpaid stock. [Erskine v.
Lowenstein, 82 Mo. 1. c. 305-6; Gilbert v.
Gilbert, 33 Mo. App. 1. c. 268.] In view of the fore-
going, we have carefully read and considered the evi-
dence in the case, in order to pass upon same, indepen-
dently of any conclusions which may have been reached
by the referee and trial court. Our views of the case
are in accord with those of the referee in respect to the
facts, and, hence, we have adopted that portion of the
referee's report heretofore set out, which we will
supplement with a few additional observations, based
upon the evidence and record before us.

**Equitable Proceeding.**

II. Under proposition one of appellant's "Points
and Authorities," it is said: "Appellant was a bona-
fide purchaser of the stock without knowl-
edge that it was partly unpaid, and he is
not liable."

**Purchaser's Knowledge.**

In considering this question, it is important to keep
in mind certain provisions of our organic and statu-
tory laws relating to the capital stock of railroad cor
porations.

Section 8 of Article XII of our Constitution pro-
vides that "no corporation shall issue stock or bonds,
except for money paid, labor done or property actually
received, and all fictitious increase of stock or indebted-
ness shall be void."

Section 2981, Revised Statutes 1909, provides that:
"the stock or bonds of a corporation shall be issued
only for money paid, labor done or money or property
actually received. . . . All fictitious issues or in-
crease of stock or of bonds of any corporation shall be
void."

In view of the above provisions of our Constitution
and Statute, notwithstanding the certificate of incorpo-
ration issued by the Secretary of State to said railroad
company, we may determine in this proceeding what

portion of the stock issued had been paid, when it was delivered to E. E. Evans, and by him thereafter sold to appellant. [Hess Warming & V. Co. v. Grain Elev. Co.. 280 Mo. 163.]

It appears from the articles of association that E. E. Evans subscribed for 280 shares of the capital stock of said railroad company, in December, 1911, and that the ten directors heretofore named each subscribed for two shares of said stock, making the total amount of capital stock subscribed 300 shares of the par value of $100 each. At the organization meeting of the directors of said railroad company on March 23, 1912, the following occurred, as shown by the record of said company, to-wit:

"Mr. Wyatt moved that the company purchase the rights-of-way, contracts, field notes and all property pertaining to proposed road between Bismarck and Sunlight, from E. E. Evans, and pay said Evans for same, including all moneys advanced for organization expenses, the sum of one hundred and two thousand dollars, said property to be free and clear of debt, and that said consideration be paid two thousand dollars in cash and one hundred thousand dollars in common stock of the company, full paid and non-assessable; seconded by Mr. Hathaway, and carried."

In passing, it is well to observe that the record shows E. E. Evans and the ten directors at said meeting were pretending to represent themselves, as well as the railroad company with which they were dealing.

As heretofore stated, we find from the evidence that the 1000 shares of stock issued to Evans was paid to the extent of not over twenty per cent. That eighty per cent, or eighty dollars on each of said shares, is unpaid. In the light of foregoing, was appellant a bona-fide purchaser of that stock which he received from Evans, without notice that a large portion of same was unpaid when he bought it?

It is fair to assume from the evidence that appellant is at least a man of average intelligence and busi-

ness qualifications. He was engaged in manufacturing and selling lumber at Bunker, Missouri, in 1912. He was a stockholder and manager of the Hamilton-Ryan Construction Company, which did some of the grading on said road in the fall of 1912. He was also at one time a director in said railroad and, at another time, president of said railroad company.

Appellant became interested in having the road run to Bunker, and wrote to Evans at St. Louis in January, 1912, in regard to the matter. He testified that he met Evans in St. Louis, Missouri, in January or February, 1912. E. E. Evans testified, in regard to what occurred between himself and appellant, while the latter was in St. Louis, as follows:

"Q. Well, did you tell him that you had received one thousand shares of stock for your services? A. Bunker was apprised of that fact at St. Louis, I think, about his first trip up here.

"Q. He had been apprised of that fact? A. Yes, sir.

"Q. And then he knew for this one hundred and two thousand dollars that had been voted to you you had received one thousand shares of this stock? A. Yes, sir.

"Q. On his first visit up here in the spring of 1912? A. Yes, sir."

E. E. Evans further testified as follows:

"The organization was on the 23rd of March, 1912, and our first survey went out of Bunker along about the 25th or 26th of April, Bunker towards Sunlight.

"Q. Before that, then, you had no conversation with Mr. Bunker about this railroad, had you? A. We had one letter, if I recall right, and he was in the city once.

"Q. And you had then talked with him about this railroad and about what you were doing? A. Why, most assuredly I talked to him about this railroad and what we were doing and going to try to do.

"Q. You told him the whole thing from beginning to end? A. Yes, sirree."

Appellant testified that sometime during the spring or summer of 1912 he examined the records of the railroad company, and saw that part of it relating to the issuance of 1000 shares of stock to Evans. No grading had been done at that time. Appellant further testified:

"Q. Now, let me get that. You saw this record and you found that $100,000 in stock had been voted to Evans? A. Yes, sir.

"Q. And that $2,000 in cash had been voted to Evans? A. Yes, sir.

"Q. And you understood that those seven directors, taking two shares each, paid for their stock out of this $2,000? A. I understood that this money came from those directors. The record, I believe, showed— I think it was exactly $2,000.

"Q. And all that had been voted to Evans for services? A. For services in the connection with the survey, rights-of-way, and so on, from Bismarck to Sunlight. . . .

"Q. Well, that resolution provided for the payment to Evans? A. Yes, sir.

"Q. Then, that didn't leave any money in the treasury? A. I think not."

Without considering the evidence further, we are of the opinion, that appellant bought the stock in controversy, with both actual and constructive notice that not exceeding twenty per cent of same had been paid, and that the remaining eighty per cent had never been paid. Under the facts thus found, the judgment below was for the right party. [Shickle v. Watts, 94 Mo. 410; Van Cleve v. Berkey, 143 Mo. 109; Banking Co. v. Independence Mfg. Co., 168 Mo. l. c. 645-6; Berry v. Rood, 168 Mo. l. c. 332-3; Bank v. Rockefeller, 195 Mo. l. c. 54-5; Brewing Assn. v. Novelty Co., 120 Mo. App. 513; Leucke v. Tredway, 45 Mo. App. 507.] Numerous other authorities in this State, and elsewhere, are in accord with the principles of law announced in foregoing cases.

III. It is contended by appellant, that the blocks of fourteen shares and eighty shares are not transferred on the corporate books from Evans to appellant, and **Equitable Owner.** that he is not liable thereon. Appellant was undoubtedly the equitable owner, at least, and was entitled to have the stock transferred to himself on the books of the company. As we are dealing with this case upon equitable principles, we can conceive of no good reason for relieving him from the unpaid portion of said stock. [Wilson v. Ry. Co., 108 Mo. l. c. 609; Moore v. Bank of Commerce, 52 Mo. l. c. 379; Boatmen's Ins. & Tr. Co. v. Able, 48 Mo. l. c. 139-40; Chouteau Spring Co. v. Harris, 20 Mo. 382-3; Kretzer v. Cole Bros. Rod Co., 181 S. W. (Mo. App.) 1066-7-8; Dain Mfg. Co. v. Trumbull Seed Co., 95 Mo. App. l. c. 146-7.] The above contention is without merit and is overruled.

IV. We have carefully examined and fully considered the issues presented in this case. The judgment rendered in the court below meets with our approval, and is accordingly affirmed. *White, C.,* concurs; *Mozley, C.,* not sitting.

PER CURIAM:—The foregoing opinion of RAILEY, C., is hereby adopted as the opinion of the court. All of the judges concur.